PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al. and three other causes.

In re CENTRAL PARK, N. & E. R. R. CO.

Nos. 2—9, 2—33, 2—149, and 3—37.

(District Court, S. D. New York.    September 26, 1913.)

1. STREET RAILROADS (§ 49*)—LEASE—INSOLVENCY OF LESSEE—ACCOUNTING BETWEEN PARTIES.

A lease of a street railroad provided that whenever the lessee deemed it expedient it might change the motive power in use at its own expense. It was further provided that in case it made such change on its request the lessor should issue and deliver to it mortgage bonds for the amount of the expenditure, but the lessee expressly assumed payment of such

bonds. It made and paid for the change to electric power, but made no request for the issue of bonds therefor, and some eight years afterward the lease was terminated by reason of its insolvency. *Held*, that on an accounting between the parties it was not entitled to set off, against claims owing to the lessor for breach of the lease, the amount expended by it in making the change of power.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

2. STREET RAILROADS (§ 49*)—LEASE—INSOLVENCY OF LESSEE—ACCOUNTING BETWEEN PARTIES.

Various items of debit and credit considered on an accounting between the lessor and lessee of a street railroad on termination of the lease through insolvency of the lessee.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

This cause comes here upon exceptions to the findings and conclusions of the special master.

See, also, 208 Fed. 747, 757 .

The following is the opinion of the special master:

On the 1st day of March, 1910, two orders were made directing the filing not later than March 2, 1910, of the claims of the Central Park, North & East River Railroad Company against the Metropolitan and City estates nunc pro tunc as of the last day fixed for filing of such claims, such date in the case of the Metropolitan estate being January 15, 1908, and of the City estate December 10, 1907. Claims were duly filed, that against the Metropolitan being based on alleged breaches of covenants contained in the Central Park lease of October 14, 1892, to the Metropolitan Crosstown, which was devolved by operation of law through successive consolidations upon the Metropolitan Company and that against the City Company by virtue of the Metropolitan-City lease of 1902, which went into effect on April 1st of that year, which it is asserted operated as an assignment of the earlier lease mentioned and expressly assumed the performance of such covenants. The items of damage alleged are for failure to keep roadbed in repair $500,000, and a similar failure as to rolling stock for a like amount; for failure to pay certain real estate taxes aggregating $4,960.13, and certain specific franchise taxes $256,120.17; for failure to meet $1,200,000 with certain interest of outstanding Central Park bonds, secured by mortgage, issued and made December 1, 1872, payable in 1902; and for failure to return a cash item of $108,000, claimed to have been taken over by the Metropolitan at the inception of the Central Park lease, the aggregate of the items exclusive of interest being $2,569,080.30. The claim as filed against the City Company alleges identical breaches of the same covenants, demanding the same damages, the liability being based on privity of estate or contract. These claims were amended by orders dated December 6, 1911, allowing a demand for failure to repave within the railroad area amounting to $179,479.63. An offset is claimed by the respondent Metropolitan receiver of $861,729 for improvements, being based on certain provisions of the Central Park lease. The disposition of most, if not all, of the items will be controlled by the views taken of similar contentions involved in the claim of the Second Avenue Company expressed in the memorandum recently filed respecting that claim to which counsel are referred for a fuller statement of those views than will be necessary here.

(1) Item of damage for failure to keep roadbed in repair now reduced by claimant to $88,044.80.

As reduced it includes two items which are objected to. The first is an item of $3,500 for repairing the crossing at Fifty-Ninth street and Columbus avenue. It appears that the Metropolitan receivers did repair this crossing

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

at an expense of $3,500 and brought suit for the amount, which has not been prosecuted to judgment. There are no facts establishing the liability of the Central Park Company in the record, as counsel points out. It is plainly an item to which claimant is entitled, and it is allowed unless the respondent receiver concedes that the claimant is free from any liability for the money expended on this repair.

The second item is for raising the tracks at the approach to the Queensboro Bridge amounting to $10,094.79. This work was not begun until November 13, 1908, three months after surrender of the lines to the Central Park Company, and it has not been shown that the Metropolitan or its receivers were ever called on to do the work. Clearly this claim was not in existence on January 15, 1908, and cannot be allowed. It is not a question of repair.

The item is allowed against the Metropolitan estate at $77,910.01 subject to the possible deduction indicated.

(2) Item of damage for failure to restore personal property. Minimum claimed $394,897. Maximum claimed $450,000.

Thus reduced, these alternative demands represent claimant's ideas as to the value of 210 horse cars, 1,206 horses, 225 sets of harness, and 1,209 bridles. Only the valuation to be placed on the horse cars suggests dispute; the valuation of the other items being substantially conceded. The amounts to be reported respecting these latter will be.

Horses ......................................................... $205,020
Harnesses ...................................................... 5,377

$210,397

Claimant makes two contentions in support of the valuation that it asks me to place on the horse cars, which it insists should not be less than $184,500:

1. That there should be included in this valuation the value of some 40 electric cars substituted for some 14 horse cars in use on the Fifty-Ninth Street line before electrification on the theory that they are "substitutes, increments or additions," within the meaning of the lease, to the delivery of which they became entitled on its termination.

2. That the Metropolitan must account for the value of these cars in 1892, and not for the value in 1908, when the right to the delivery under the lease accrued.

Respecting the first contention, it is sufficient to say that it has already been determined adversely to the claimant by the court. Pointing out that this case differs from the Second Avenue, in the respect that no part of the construction nor any part of the equipment was paid for by the lessor, Judge LACOMBE distinctly holds that these electric cars were not substitutes for the horse cars. There is no additional evidence in the record here to justify any other or different finding.

As to the second contention, it seems equally certain that, failing to return the identical 210 cars in the stipulated condition at the termination of the lease, the lessee is bound to account for their value at that time and not for the value at the inception of the lease. If at the time of surrender the lessee had gone into the open market and purchased 210 horse cars of the same type as the original cars in the stipulated condition of efficiency and repair, the lessor would have been bound to accept them, if tendered. The Metropolitan creditors are certainly not bound by any higher value nor in any way concluded by the reports based on original costs a dozen years and more prior to 1908, contained in the railroad reports. The question is whether the value as of that date can be determined with approximate fairness from the evidence. The claimant's manager, Mr. Linch, testified that $150 a car, both for box and open cars, was about the fair market value in 1908. This testimony was elicited on cross-examination and is met by testimony of respondent's expert, that the value was from $110 to $125 per car at that time, and that 200 or more cars could then have readily been obtained, which is what Mr. Linch himself testified in effect. He also testi-

fies that in 1908, he leased 60 closed cars and 45 open cars from the Metropolitan receivers, and that from $100 to $150 was the amount required to put them in fair operating condition. On the whole it would seem from evidence such as this, which is doubtless the best that the nature of the case permits, that $250 per car for each of the 210 cars to the return of which the claimant became entitled was their full value at the time the right to the return accrued and would be an ample allowance to suggest to the court. This amounts to $52,500, making the total allowance to be reported under this head $262,897.

3. Item of damages for paving, amount claimed $173,731.21 and interest $5,455.72; total $179,186.93.

Of the principal sum, two items are conceded. These are the judgment against the Central Park Company of $104,944.15 and the two paving items which claimant under its agreement with the New York Central Railway Company was liable to pay amounting to $54,251.62. This sum is $159,195.77.

The paving claims represented by the difference, which is $16,530.44, is disputed. It is sufficient to say with reference to these claims that no notice to repair the areas covered by these items was ever served on the Central Park Company, though it may have been on the sublessee, the City Company. I think that as a matter of law no liability for such claims exists (130 App. Div. 842, 115 N. Y. Supp. 878), and that they should not be allowed.

Interest from the completion of the work to October 1, 1907, only can be allowed. This amounts to $533.68. The balance of interest claimed is on work completed after the appointment of the Metropolitan receivers on October 1, 1907.

It results that $159,195.77, with $533.68 interest, or $159,729.45, should be suggested under this head.

4. Item of damages for unpaid real estate taxes and special franchise taxes $230,071.56 and interest.

These real estate taxes amount to $4,965.13 and became liens on the real estate of the Central Park Company prior to the making of its lease to the Metropolitan in 1892. Counsel for the receiver apparently thinks that the only clauses in the lease which can be pointed to as suggesting a possible right to the allowance is the covenant to pay taxes which is, of course, prospective, and the clause assuming liabilities. Like the Second Avenue lease, however, this lease contains a promise that the lessee would pay, save harmless and indemnify the lessor from and against any and all unpaid taxes and all lawful claims and demands existing at the date of the lease. The interest on these taxes to October 1, 1907, is $8,760.88, subject to verification, so that the total amount allowable is $13,726.01. To this must be added the tax lien transfer and interest in all $471.29.

The special franchise taxes claimed are from 1901 to 1907, inclusive, and amount to $161,924.19, the interest, subject to verification, being $35,041.48, and are allowable as in the Second Avenue case. The total of amounts allowable are:

|  |  |  |  | Totals. |
|---|---|---|---|---|
| Tax lien transfer.......... | $197.36 | Interest | $273.93 | $471.29 |
| Real Estate Taxes.......... | 4,965.13 | " | 8,760.88 | 13,726.01 |
| Franchise taxes............. | 161,924.19 | " | 35,041.48 | 196,965.67 |
|  | $167,086.68 |  | $44,076.29 | $211,162.97 |

(5) Item of damage for money delivered at the inception of the lease, $108,618.16.

With respect to this item claimant has been able to present somewhat more proof than was possible to claimants in the Second Avenue case. The record affirmatively shows that the books of account of the Metropolitan Crosstown, of the Houston & West Streets & Pavonia Ferry Railroad Company, and of the Metropolitan itself, covering the period in 1892, when the cash was taken over, have wholly disappeared, and the minute books of the two former companies as well. A minute book of the Central Park Company covering the period from 1877 to 1895 was produced from the custody of

officers of the Central Park Company, who had been chosen long after the making of the lease when the Metropolitan was in control. The book contains minutes of a meeting on November 14, 1892, a month later than the lease, at which an examination of the accounts and vouchers of the company for October, 1892, was certified. Minutes of a meeting of the same committee on December 2d following sets forth a report containing the following:

"The Committee also have examined and certify that the total amount of cash on deposit to be turned over to the Metropolitan Crosstown Railway Company this day by check pursuant to the terms of the lease dated October 14, 1892, is as follows:

In the Mercantile Trust Company of N. Y. City General a/c...... $ 1,077 45
In the Mercantile Trust Company Tax Reserve a/c............ 25,769 95
In the Bank of New Amsterdam N. Y. City General a/c........ 81,270 76
In the office of the Company, Petty Cash...................... 500 00

$108,618 16

"Besides yesterday's and to-day's receipts in hands of receivers, conductors and in course of collection, less payments made therefrom not yet adjusted and interest on above deposits to this date.
"[Signed]                                                Jno. T. Terry,
                                                         "Charles Dana."

The minutes of finance committee meetings were approved by the directors on December 13, 1892, and on September 12, 1893. Mr. Hasbrouck, who was prior and subsequent to the making of the lease a director and vice president of the lessee company, and a director, treasurer, and either vice president or secretary of the Houston & West Streets & Pavonia Ferry Company reported to the directors of Central Park Company (of which he had been made a director and vice president after the lessee assumed control and on April 5, 1893), submitted his report to the directors that the property had been turned over to the lessee and the terms of the lease faithfully complied with. These minutes are, of course, objected to as self-serving declarations; but, on the theory adopted in the Second Avenue case, they may be regarded as admissions of the lessee, it being in control under the lease. Evidence that the funds in the Mercantile Trust Company and the Bank of New Amsterdam, presumptively those specified in the minutes, were paid out on December 5, 1892—when the lease under the lease was in control—was also introduced.
. The allowance of $108,618.16, will be recommended, but without interest, as that was not reserved.

(6) Item of rents paid receivers for horse and electric cars and for horses, $114,229.33.

This item embraces the rents paid subsequent to August 5, 1908, which ended the receivers' period of occupation, for property of the nature indicated, under orders of the court and under reservation that the amounts so paid should be refunded, if it should be established that the cars and horses were the property of the claimant.

This item is not provable in this proceeding. We are concerned here with ascertaining claims against the Metropolitan Company, fixed in their nature, arising out of breaches of covenants in the lease, actually or constructively in existence as of January 15, 1908, against that company, but not claims arising out of acts of the receivers after the termination of the period of experimental occupation. The evidence of identity of cars leased by the receivers with those originally turned over in 1892 may, under the reservations, be pertinent in the use and occupation proceedings, but surely cannot be involved in this. Its disallowance will therefore be recommended.

(7) Item of damages for the principal of the Central Park bonded debt.

This item is based on the assumption clause contained in the lease of 1892. This the claimant, as did claimants in the Second Avenue case, regards, as between lessor and lessee, as an absolute and unconditional promise; but the courts hold it to be, even as between the parties, as only a

promise to answer for any deficiency in the value of the property, which is held to be the primary fund for payment, to be resorted to before resort may be had to the lessee under its covenant. Farmers' Loan & Trust v. Central Park Co., 193 Fed. 963, 113 C. C. A. 591; Second Avenue Bondholders' Appeal, 198 Fed. 747, 117 C. C. A. 503.

On the day fixing provable status, January 15, 1908, this claim was clearly contingent and cannot therefore be allowed. It may be added that in this case, unlike the Second Avenue case, a sale has been had, and an amount in excess of principal, interest, and taxes due has been realized.

(8) Item of rental unpaid during the period of occupation, $81,000.

This item suggests no dispute and is allowed.

(9) Item of legal expenses, $29,893.17.

This item is based upon a covenant to indemnify from all expenses of prosecution or defense of actions or proceedings pending at the time of the lease or brought at any time thereafter against the lessor for any lawful claim existing at the time of the lease.

The request for services claimed for and the rendition of such services were after January 15, 1908, and must be disallowed for that reason. It may be noted that a large part of the amount claimed was for services not in connection with actions pending or claims existing at the time of the lease, and are therefore not within the covenant in any event.

(10) Items of car license fees, $8,350, repairs to cars $15,750, and for 40 electric cars $104,500; $128,640.

The item relating to the 40 electric cars has been disposed of in another connection and is disallowed. That for repairs of cars so far as it suggests any provable claim—and I do not think it does—has been fully disposed of in connection with the valuation placed upon the horse cars. As to the car license fees they are for 1908, there is no proof that the Central Park Company ever paid them, and, if it did, it was under no legal liability to do so, as the receivers and not it were operating, so that the payment, if made, was voluntary. City of N. Y. v. Sixth Ave. R. Co., 77 App. Div. 367, 79 N. Y. Supp. 319. Moreover, it is not at all clear that the fees were due from any one on January 15, 1908, for no proof of the ordinance was offered. They should therefore be disallowed.

It remains to be determined whether the respondent receiver is entitled to the offset claimed of $861,792.37 of expenditures for the electrification of Fifty-Ninth street and of Tenth avenue, the amount of which are conceded. The lease contains the same covenant to issue bonds for the betterments of this nature secured by lien of mortgage which is present in the Second Avenue lease and the right to bonds of the face value of these expenditures was complete on October 1, 1907, when the Metropolitan receivers were appointed, although no demand up to that time had been made. The Central Park lease does, however, expressly assume and agree to pay these bonds, which the Second Avenue lease did not do. Even with this assumption, however, the respondent is, I think, entitled to the equitable offset claimed for the reasons more fully stated in the memorandum filed in the Second Avenue Company's claim for breach of lease to which counsel are referred and it is therefore allowed.

As against the Metropolitan estate, the result reached may be thus summarized.

| | | | |
|---|---|---:|---:|
| 1. | Roadbed | $ 77,910 | 01 |
| 2. | Equipment | 262,897 | 00 |
| 3. | Paving | 159,729 | 45 |
| 4. | Taxes | 211,162 | 97 |
| 5. | Loan | 108,618 | 16 |
| 6. | Rent during occupation | 81,000 | 00 |
| | · Total | $901,317 | 59 |
| | Less | 861,792 | 37 |
| | Amount allowed | $ 39,525 | 22 |

As against the City Company the disposition to be recommended to the court in the Second Avenue breach of lease claim will dispose of the items 1, 2, 5, and 6 above stated, as not allowable. Of the franchise taxes, which are allowable, viz., the franchise taxes from 1902 to 1906, inclusive, the principal sum aggregates $139,544.41, and the interest subject to verification to $27,848.64; a total of $167,393.05. The only item here involved which is not disposed of in the Second Avenue case is the item of paving claims. I think the liability of the City Company is either to the city of New York, or to the Metropolitan Street Railway Company for charges such as these and not to the Central Park Company at all. These charges are clearly not "rent" within the meaning of article 3 of the Metropolitan-City lease, as recently construed by the Circuit Court of Appeals. The covenants contained in articles 2 and 4 which include them are just as clearly for the benefit of the Metropolitan Company and not for that of third parties. Welden National Bank v. Smith, 86 Fed. 398, 30 C. C. A. 133. So the similar covenant in the Central Park lease is, in its nature, personal and not such as runs with the land, even if the Metropolitan-City lease could be considered as operating as an assignment of the former lease, which, for the reasons suggested respecting the practically identical Second Avenue lease, I do not think it can. It may be noted that the City Company was vouched in, in the action by the City of New York which resulted in the judgment for $104,944.15 constituting the larger part of this amount claimed here and allowed against the Metropolitan estate. None of the paving claims has ever been paid by the Central Park Company.

Proposed reports in accordance with the foregoing should be filed with me and served on respondents on or before May 12, 1913, and proposed amendments and objections thereto five days later.

J. Parker Kirlin, of New York City, for Metropolitan St. Ry. Co.

James L. Quackenbush, of New York City (Jas. T. Mason, of New York City, of counsel), for New York City Ry. Co.

Dexter, Osborn & Fleming, of New York City (M. C. Fleming, of New York City, of counsel), for receiver of New York City Ry. Co.

Byrne & Cutcheon of New York City (Chas. M. Travis, of New York City, of counsel), for Pennsylvania Steel Co. and Degnon Contracting Co.

Davies, Auerbach & Cornell, of New York City (B. Tolles, of New York City, of counsel), for Guaranty Trust Co. of New York, Second Ave. R. Co., and Lynch, as receiver.

Chas. T. Payne and Geller, Rolston & Horan, all of New York City, for Farmers' Loan & Trust Co.

Geo. N. Hamlin and O'Brien, Boardman & Platt, all of New York City, for committee of contract creditors of New York City Ry. Co.

Charles Benner, of New York City, for committee of tort creditors of New York City Ry. Co.

Simpson, Thacher & Bartlett, of New York City, for committee under Metropolitan St. Ry. Co. stockholders protective agreement.

Strong & Mellen, of New York City (Mr. Chase, of counsel), for Central Park, N. & E. R. R. Co.

Chas. H. Tuttle, of New York City, for Cornell and Belt Line Ry. Corp.

Richard Reid Rogers, of New York City (Jas. T. Mason, of New York City, of counsel), for Central Crosstown R. Co. and New York Rys. Co.

L. C. Krauthoff and J. P. Cotton, Jr., both of New York City, for committee acting under a plan of reorganization of Metropolitan St. Ry. Co.

Masten & Nichols, of New York City (Arthur H. Masten, of New York City, of counsel), for receiver of Metropolitan St. Ry. Co.

Page, Crawford & Tuska, of New York City (Wm. H. Page and Gilbert H. Crawford, both of New York City, of counsel), for Metropolitan Express Co.

LACOMBE, Circuit Judge. Touching the allowance and disallowance of various items of claim for paving the roadway in proximity to the tracks, I infer from the reply brief that, of the items disallowed on the theory that the city of New York could not recover for them against the Central Park

Company, judgment has since been actually entered against the latter company for $7,012.42 in favor of the city of New York. If that be so, upon a proper recital in the decree, the amount awarded by the master for these items of paving should be appropriately increased. With this possible exception the special master's findings and conclusions as to these paving claims are confirmed.

Referring to claim touching the old bonds of the Central Park road, $1,-200,000, I have serious doubts as to the soundness of the special master's conclusions, finding much force in the contention that as between lessor and lessee—leaving the bondholder out of consideration—on December 1,. 1912, when the lessee elected not to have the bonds renewed by the lessor, they constituted a matured obligation then due which the lessee had agreed. to pay. Inasmuch, however, as the determination of the questions presented, will depend probably upon the interpretation of former opinions of the Court of Appeals, it seems best to confirm the findings and conclusions as to this part of the claim without further comment.

[1, 2] As to the counterclaim, the special master's allowance thereof is not sustained. The case differs materially from that of the Second Avenue, because by the terms of the lease the predecessor of the Metropolitan Company expressly undertook itself to pay the expense of changing the motive power of the road, etc. In each lease there is a clause providing that, in certain contingencies, the lessor company is to issue bonds for the amount of expenditures for such purposes. In the one case, however, the lessee did not contract to pay such bonds in case they were issued; in the other, it specifically assumed these very bonds as an obligation, which it was to provide for and pay. The situation seems to be this: Having determined to make the change, the lessee contracted with railroad builders and supply men for what was necessary to complete the work. When the work was done and the bills were presented, the Metropolitan had a choice of two ways in which to pay them. It could have done so out of any surplus cash it had on hand, or it could have borrowed the money on bonds which it could require the Central Park Company to issue. Each course, no doubt, presented its advantages and disadvantages; the first might reduce a fund which would be useful as working capital, the second would increase the fixed yearly charges to the amount of the interest on such bonds. Whichever course were adopted eventually the Metropolitan would pay the whole expense, if it fulfilled its contract. The work seems to have been fully completed and the bills for it paid by 1899. Manifestly, the Metropolitan elected to pay them out of funds of its own, for it made no request then of the lessor company to issue bonds, nor did it make any such request during all the years that elapsed until receivers were appointed in 1907. If under the terms of the contract, the lessor were ultimately to pay for this change of motive power, it might be that delay in making request for the issue of bonds would not be material; but, since the lessee was the one to pay these expenditures, the language of that clause of the lease seems to me to contemplate that if it should need the aid of the lessor's credit to enable it to pay them it should make its request for such credit within a reasonable time after incurring the obligations. The time when the request to issue bonds is to be complied with is "whenever it shall be deemed by the party of the second part expedient * * * to change the motive power." If just before receivership, in January, 1907, the Metropolitan, eight years after it had made expenditures which under the contract it was itself to pay for, had requested the Central Park Company to issue these bonds and the request had been refused, I do not think it could have enforced their issue under the terms of the contract.

Except so far as required by this opinion, the exceptions are overruled and the report confirmed.