**XENIA (City), Plaintiff, v. BALTIMORE AND OHIO RAILROAD COMPANY, Defendant.**

Common Pleas Court, Greene County.

No. 27953.   Decided June 15, 1953.

William A. Miller, Xenia, for City of Xenia.
Marcus McCallister, Xenia, Frank H. Cole, Jr., and Robert O. Smith, Cincinnati, for Baltimore & Ohio Railroad Company.

(PORTER, J, Miami County, sitting by assignment.)

## OPINION

By PORTER, J.

There is pending for decision a demurrer to the amended

petition of the plaintiff. The stated ground of the demurrer is that the facts stated in the petition do not constitute a cause of action in favor of plaintiff against the defendant.

In the petition, the City, by its City Solicitor "acting under §286 GC," states the following:

"That the defendant, the Baltimore and Ohio Railroad Company is a corporation duly incorporated in the State of Maryland, and operating a steam railroad in and through the said City of Xenia, Greene County, Ohio.

"That the Bureau of Inspection and Supervision of Public Offices of the State of Ohio filed with the City Solicitor of the plaintiff city on May 14, 1952, a report of examination of the City of Xenia, Ohio, from March 1, 1948 to January 31, 1951, in accordance with §286 GC, and that said report contains a finding for recovery for an illegal payment against the defendant and so much of said report as relates to the claim against the defendant therein is in the following words and figures, to wit:"

It then sets out a verbatim copy of the report of the State examiner, explaining his finding in favor of the City of Xenia against the Baltimore and Ohio Railroad Company for $5,826.00, which it is the purpose of the City to recover in this suit.

The substance of the report is that the examiner found from the City Commission's records "the evident necessity for the installation of a storm sewer from Washington Street to Shawnee Creek, under and across the tracks of the Baltimore and Ohio Railroad Company and also other property."

The report next noted that Ordinance 962, dated April 27, 1950, authorized city officials to execute a contract of license between the City and the Railroad, showing permission granted by the Railroad to the City to lay and maintain the storm sewer under and across the land and tracks of the Railroad. This was done at the request of the Railroad.

An agreement was entered into in accordance with the provisions of Ordinance 962, and it is set out in the report in part. It shows that the part necessary to note is that in consideration of the agreement of license the Railroad licensed and permitted the City to lay and maintain the storm sewer in accordance with plans attached, "subject to the following terms and conditions:

"(4c) Licensee covenants and agrees not to assess or charge railroad, or the property of railroad, directly or indirectly, for or on account of the improvements of which said pipes are a part."

The examiner notes that in this section the City agrees to assume the entire cost of such storm sewer.

He then observes that an examination of the franchise of the Railroad's predecessor, approved July 17, 1876, provides in Section 2, first part, as follows:

". . . and shall provide and construct under its roadbed the necessary culverts and drains to completely drain said streets and crossings and keep them free from stagnant water.

"Therefore, any agreement made by the officers of the City pertaining to the drainage of streets effected (sic) by the Baltimore and Ohio Railroad, must be in accordance with the ordinance of the City, unless another ordinance countermands such facts.

"It is noted that Ordinance No. 962, does not provide for any such changes."

He then sets out the complete franchise ordinance passed in 1876. After that he says:

"Certainly the city mayor and auditor cannot legally effect any changes in the laws of the city, only the members of the city commission are so empowered; and the city commission did not see fit to change the franchise ordinance, particularly section 2, first part, when Ordinance No. 962 was passed.

"Therefore, we can but hold that any cost accrued in constructing a storm sewer under and across the tracks of the Baltimore & Ohio Railroad must be borne by said Railroad."

The report continues with a finding that the legal ad was proper and a contract was entered into July 17, 1950 with K. H. Gregory for the installation of the storm sewer for 847 feet. The examiner sets out the unit price and items of the bid, and follows that with this interesting statement:

"Your examiner determined to find out the exact cost to the Railroad of said improvement, and was **told** by the City Manager that two items on the contractor's estimate were definitely Railroad charges. Therefore, such amounts as were so paid by the City should be reimbursed by the Railroad as follows:

"372 lineal feet 24 inches extra strength re-inforced concrete culvert pipe a. f. t. m. c. 76-41 at $15.50—$5,766. 1000 feet b. m. sheeting left in place @ $60. 60 Total **illegally** paid by City . . . $5,826. (Emphasis supplied.)

He rendered a finding in favor of the City in that amount.

That concludes the report. The petition concludes with a simple statement that the Railroad is indebted to the City in said sum of $5,826.00, with interest, for which it prays judgment.

The Railroad urges that there are three reasons its demurrer is well taken. The first is that the petition shows on

its face that it has not received and does not hold any public money, and that there is nothing in §286 GC which creates a cause of action in favor of a city, or other political subdivision, except in cases where the defendant has received or holds public money which has been illegally expended, or public property which has been converted or mis-appropriated:

City of Youngstown v. Youngstown Municipal Rwy. Co., 134 Oh St 308; State, ex rel. Smith v. Maharry, 97 Oh St 272; Township Trustees of Ottawa Township v. Village of Ottawa, 4 O. O. 452, 20 Abs 353.

The second is that the petition shows on its face that the 1876 franchise (Section 2, first part) requires that the Railroad completely drain Washington Street and keep it free from stagnant water, and that there is nothing in the petition to show that it has not done this.

It is also the Railroad's position that even if it is conceded for the sake of argument that it did fail to provide adequate drainage in Washington Street, the petition shows on its face that the plaintiff did not notify the defendant that it had defaulted in its obligation, and shows on its face that the City did not demand that the Railroad provide adequate drainage. The Railroad maintains that this is a fatal defect, and cites the following as authority for its position:

City of New York v. Metropolitan St. Rwy. Co., 115 N. Y. Sup. 878; Texas Bitulithic Co. v. Abilene St. Ry. Co., 166 S. W. 433; Pennsylvania Steel Co. v. N. Y. City Ry. Co., 208 Fed. 777; Pittsburgh v. Pittsburgh Rys. Co., 83 Atl. 67; Edwards Hotel & City R. Co. v. Jackson, 51 So. 802.

The third reason is that statutes on public improvements require a notice to be given a land-owner who is expected to pay a share of the costs. I do not believe that it is necessary to consider this principle of the law of assessments because this is not an assessment, but an effort by the City to collect what it claims the Railroad owes the City under its franchise.

The discussion which follows is, therefore, confined to a determination of the validity of the first two reasons advanced by the Railroad in support of its position; and also to a determination of the validity of the City's argument in support of its position. Such discussion begins with an examination of part of §286 GC which is believed to be pertinent:

"If the report sets forth that any public money has been illegally expended, or that any public money collected has not been accounted for, or that any public money due has not been collected, or that any public property has been converted or mis-appropriated, the officer receiving such certified copy

of such report, other than the auditing department of the taxing district, may, within ninety days after the receipt of such certified copy of such report institute or cause to be instituted, and each of said officers is hereby authorized and required so to do, civil actions in the proper court in the name of the political subdivision or taxing district to which such public money is due or such public property belongs, for the recovery of the same and shall prosecute, or cause to be prosecuted the same to final determination."

Later on in the same section the term "public money" as used herein is stated to "include all money received or collected under **color of office** whether in accordance with or under authority of any law, ordinance, or order, or otherwise, and all public officials shall be liable therefor." (Emphasis added.)

The City conceded that the petition shows on its face that the Railroad has not received and does not hold any public money. It makes no claim that the finding is for "any public money due (which) has not been collected." Its theory is that by not performing the duty enjoined by the franchise, the Railroad has "converted or mis-appropriated" public property within the meaning of the term as used in this section. That is too far fetched.

The City's concession mentioned above is not made in its memorandum in opposition to the demurrer, but was made when the matter was argued orally. At that time the City's solicitor narrowed the issues before the Court considerably by agreeing that the chief question is one of procedure and burden of proof. Its position is that it is entitled to sue as it has on the examiner's findings and that such will constitute a prima facie case in its favor. Its position is that the examoner's finding has a certain weight and §286 **GC** gives the City the benefit of that weight or advantage of having the burden of proof shifted to the Railroad after proof of the finding. Furthermore, the City's position is that if the Railroad overcomes the prima facie case and the burden shifts back to the City, it will then have the right to offer all the evidence it could in a straight suit by it to recover in a suit for damages for breach of the franchise, in which the pleadings would reflect the real issues. In other words, the City's position is that in this suit under §286 **GC** it can go beyond the findings and offer what it says in its memorandum and argument it expects the evidence to show.

This theory assumes that the findings are the result of a quasi-judicial proceeding. That in turn suggests notice, hearings, the right to be represented, the right to call wit-

nesses, the right to cross-examine. The report shows that none of these rights was had by the Railroad. The part of the report which has been underscored shows that the examiner's conclusion is based on his investigation and much hearsay and that it merely represents one man's opinion.

If the City's theory is accepted the real issues between the parties would not be made up by the pleadings and might not ever be made up. It would be hard, if not impossible, to rule on evidence because until the issues are made up there is no way of knowing what is relevant and what is not. Bear in mind that the City's position is that this action is not one for money had and received, but for damages and its position is further that it would be entitled to a jury trial, and that the damages allowed should be the amount which the jury determines as just compensation for the loss to the City as a result of the alleged failure of the Railroad to perform the duty which it says the franchise enjoins. Its position is that it would not be limited in any recovery to the amount of the findings.

The City considers that one of the questions in this case is—what is the power of the State Auditor? Does he have the right to examine matters other than the legal expenditures of money and go into matters like this and that posed in the illustration on page 3 of the plaintiff's brief? In this respect the case before the Court is stated to be one of first impression.

The City argued that the cases cited by the Railroad in support of the first ground of the demurrer are not in point, but after looking at them the Court feels that they are for they make clear that actions under §286 GC must involve "public money" which is illegally paid or must in some other way come under the statute. Some question arose in the Court's mind that this case might be one in which the defendant could be said to owe money under its franchise and that being the case it might be an action for "public money due which has not been collected" within the meaning of that term as it is used in the statute (third paragraph, fourth and fifth lines). But the answer lies in the definition of "public money" contained in the third to the last paragraph of the same section. According to that "public money" as used herein "shall include all money received or collected under **color of office** . . ." (Emphasis supplied.)

It is clear that this is not such a case.

While this discussion, starting as it does with the City's position, may seem to have the cart before the horse, I really believe that such is not the case because the City has

taken the affirmative. They are trying to make new law. While that is sometimes a worthy endeavor, the Court fails to see merit in the City's argument so we will have to get by for a little longer on the law we have.

On the other hand, the cases cited by the Railroad are found to support its position. For briefs of these the reader is referred to the Railroad's brief, pp. 2, 3, 4, and the supplemental brief clipped thereto.

This brings us to the second ground of the demurrer. Looking at the petition in the light most favorable to the pleader, the franchise might be said to impose an obligation on the Railroad to do more than simply keep Washington Street free from stagnant water. It might be interpreted to require that it provide the necessary tiles to completely drain Washington Street. Hence, there is no merit in the Railroad's position that the petition shows on its face that it was only required to provide sufficient drains to keep Washington Street free from stagnant water. Even so, there is nothing in the petition to show that it has done that. That would be a matter of proof.

This brings us to the question of whether or not there is merit in the Railroad's position that even if the franchise requires all that the City says it does, there is no liability on the Railroad unless it is notified that it has defaulted in its obligation, and a demand is made that it provide what the City has in mind.

Four of the five cases cited by the Railroad seem to be respectable authority for the position taken. These cases are cited on page 5 of the Railroad's brief. They are as follows:

The City of New York v. Metropolitan Street Railway Co., 115 N. Y. S. 878. Railroad accepted resolution authorizing use of streets on condition it keep in permanent repair the part between tracks. In this case the City went ahead and did the repair work without any notice to the railroad. Held: it could not recover from the railroad ". . . it has the right to do the work itself, and opportunity must be given it to do so before the Company is liable."

The Court observed, p. 880:

"It will be noted that the obligation assumed by the defendant was to repair and keep in repair this street. There was no agreement that it would repay the cost of repavement made by the plaintiff; and to enforce that obligation I think it clear that an opportunity must be given the defendant to do the work before it can be made liable for a repavement or repairs made by the City. While its obligation to repave was absolutely unqualified, it had the right to do the work

itself, and a liability cannot be imposed upon it because the City voluntarily assumed this obligation without notice or in some way putting the Railroad Company in default."

City of Pittsburgh v. Pittsburgh Railways Company, 83 Atlantic 67 (Pa. Sup. Ct., 1912).

This was a suit in equity for an injunction against the Railroad to keep the street between the tracks paved, which was refused because the City had a legal remedy. The Court pointed out that there have been no cases where equity ordered paving contracts specifically enforced, but on the contrary there have been quite a number where the breach of duty has been enforced in actions of assumpsit (p. 69).

Edwards Hotel and City R. Co. et al v. City of Jackson, 51 S. 802 (Supreme Court of Mississippi, 1910). In this it was also held in Syllabus 9 that a city, desiring to pave a street for which street car tracks are maintained under a franchise, must grant to the City R. Co. the right to lay the pavement itself; and the Company is not liable for the costs of pavements laid by the City without previous notification to the Company to lay the same.

On this point the Court observed, after making the above statement:

"In short, the City has never done what is required of it before it brings this suit to recover the amount which will be owing it for paving the street; and until it has done this, and paved the street, it can have no recourse against the abutting property owners."

Texas Bitulithic Co. et al v. Abilene Street Railway, 166 S. W. 433 (Texas, Court of Appeals).

This was a case where the city's action was to enforce the payment of costs of paving part of the street between tracks. As part of the acceptance of the Railway's charter it was alleged that it agreed at its own expense and without cost to the City to keep that portion paved in the same manner as the city paved the rest of the street. Held: no recovery because no notice was given and for other reasons. The Court said in part:

"Under its contract the Railway had the right to reasonable notice of the contemplated improvement, and then either itself pave the part of the street occupied by it, or to itself secure contract therefor on the most favorable terms. No opportunity is alleged."

Construing the petition most favorably to the City of Xenia, nothing in it suggests that before the sewer was laid under the tracks (the cost of which it is the object of this suit to recover) notice was given to the Railroad or a demand made

on it to pay its share of the cost. It shows that the Railroad knew of the progress of the work on the sewer; that there were negotiations between the Railroad and the City, and that as a result an agreement was reached, part of which was that the Railroad wouldn't have to pay for any part of the improvement. That suggests the very opposite of notice and demand and makes this suit take on the aspect of a "sleeper."

The conclusion reached by this Court is that the demurrer is well taken and it is, therefore, sustained.

An entry accordingly should be furnished. It may provide that the City can have thirty (30) days from the date of this decision to plead further if it is its desire to do so, and that if it does not desire to do so that its action be dismissed, at its cost.